GARY M. RESTAINO
United States Attorney
District of Arizona

JOSEPH F. BOZDECH
California State Bar Number 303453
Assistant United States Attorney
Two Renaissance Square
40 North Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone: (602) 514-7500
Email: joseph.bozdech@usdoj.gov
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>              Plaintiff,<br><br>       v.<br><br>$60,503.00 in United States Currency,<br><br>              Defendant *in Rem*. | Case No.<br><br>**VERIFIED COMPLAINT FOR FORFEITURE *IN REM*** |

Plaintiff United States of America brings this complaint and alleges as follows in accordance with Rule G(2) of the Federal Rules of Civil Procedure, Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions:

**NATURE OF THE ACTION**

1.      This is a civil action *in rem*, brought to enforce the provision of 21 U.S.C. § 881(a)(6) for the forfeiture of property which represents money or other things of value furnished or intended to be furnished by a person in exchange for a controlled substance, proceeds traceable to such an exchange, and money used or intended to be used to facilitate a violation of Title II of the Controlled Substances Act, 21 U.S.C. § 801 *et seq.*

2.      This is a civil action *in rem*, brought to enforce the provision of 18 U.S.C. § 981(a)(1)(A) and (C) for the forfeiture of United States currency which constitutes or is derived from proceeds traceable to a violation of a specified unlawful activity, including but not limited to dealing in a controlled substance as defined at 18 U.S.C. § 1961(1) and

travel in interstate commerce with the intent to distribute proceeds of unlawful activity in violation of 18 U.S.C. §§ 1952.

3.    Venue and jurisdiction in Arizona are based upon 21 U.S.C. § 881(j), and 28 U.S.C. §§ 1355(b) and 1395 as acts and omissions occurred in the District of Arizona that give rise to this forfeiture action. This Court has jurisdiction. 28 U.S.C. §§ 1345 and 1355, and 18 U.S.C. § 981(h).

**DEFENDANT *IN REM***

4.    The defendant consists of $60,503.00 in United States currency (the "defendant currency") seized on May 8, 2024. The defendant currency is in the custody of the United States Marshals Service.

**INTRODUCTION**

5.    The following describes an investigation conducted by members of the Drug Enforcement Administration ("DEA") Financial Investigation Group's Commercial Narcotic Interdiction Unit ("FIG/CNIU" or "CNIU"), to which DEA Special Agent ("SA") Kenneth Theriault is assigned. The primary responsibility of this unit is to investigate crimes involving the use of commercial airlines and shipping companies to transport illegal drugs and drug proceeds.

6.    Based upon the experience of FIG/CNIU investigators and investigations across the country, cities located in the eastern, Midwest and southern United States are known demand locations for illicit drugs. States such as Arizona and California are source locations due to their proximity to the border with Mexico and established drug transportation routes. People involved in the illegal drug trade often hire couriers to transport drugs and/or proceeds from the sale of drugs by utilizing commercial airlines and shipping companies. The proceeds from the sale of illicit drugs are transported from demand locations to source locations. Once the proceeds from the sales of illicit drugs reach source cities the proceeds will be used to purchase more illicit drugs. The illicit drugs will then be shipped or carried by couriers to the demand locations for sale and distribution. Illicit drug trafficking organizations and illicit drug business entrepreneurs

find this lucrative because the illicit drugs are purchased in source locations for relatively low cost and sold in demand locations for a significantly higher price, thus creating high profit margins. To identify and disrupt drug and money couriers related to drug organizations and criminal syndicates, investigators use a variety of resources, including confidential informants, suspicious flight itineraries, other law enforcement agencies, and prior knowledge or intelligence of criminal activity.

7.      Factors that constitute suspicious flight itineraries include airfare purchased at the counter immediately prior to departure, or short notice reservations for a one-way travel, especially when paid in cash. Couriers travel with minimal or no luggage and often will attempt to board the aircraft at the last possible moment. Drug and money couriers use these techniques to conceal their identities from law enforcement authorities and minimize their exposure to commercial airlines.

8.      Persons traveling to source cities from demand cities with U.S. currency to be used to purchase illicit drugs also often contend with logistical issues before the drug transaction is completed which often requires the last-minute bookings or changes to itineraries to include rebooking flights.

## BACKGROUND

9.      On May 8, 2024, members of the CNIU received ticket information through a confidential source regarding Antwan Lamont Coates ("Coates") who was traveling on American Airlines flight #653 from Pittsburg, Pennsylvania to Los Angeles, California, with a connecting flight in Phoenix, Arizona.

10.     Coates came to DEA's attention because the one-way ticket was purchased 48 hours prior to departure, and because of the demand/source relationship of the travel itinerary.

11.     Investigators later learned, after contact with Coates, that he did not continue with his original itinerary to Los Angeles.

3

12. A check of the law enforcement databases revealed Coates has a criminal history including arrests for possession of controlled substance, theft, firearm charges, and fleeing to elude a police officer.

13. Based on Coates's flight itinerary and criminal history, investigators decided to attempt to make consensual contact with Coates upon his arrival in Phoenix.

14. Upon the arrival of flight #653, investigators observed a male fitting the age and physical description of Coates exit the aircraft.

15. Investigators observed Coates walk into the Panda Express restaurant located at Sky Harbor International Airport Terminal 4 concourse near arrival Gate A29 for flight #653.

16. Coates purchased food and was about to sit down at a table when DEA Task Force Office ("TFO") Myers consensually contacted Coates in the seating area of the Panda Express.

**TFO CONTACT WITH ANTWAN COATES**

17. Coates voluntarily accompanied investigators out of the restaurant area across the hallway to the bottom of the stairs near Gate A6.

18. Coates agreed to speak with TFO Myers.

19. Coates confirmed his identity. He later provided his Pennsylvania driver's license to investigators.

20. Coates stated he purchased his one-way travel ticket within 48 hours of departure.

21. Coates stated he was unsure of his return plans and did not have a ticket, but believed he was going to return Sunday, May 12.

22. Coates initially stated he had no illicit drugs and no large amounts of currency in his bags.

23. TFO Myers specifically asked Coates if he was traveling with a large amount of currency and gave an example of tens of thousands of dollars, and Coates stated he had none.

24. Coates consented to a search of his backpack and carry-on roller suitcase.

25. The roller carry-on size suitcase looked new and still had the manufacturer label/advertisement across the middle of the suitcase.

26. Coates handed TFO Koontz the suitcase and backpack to search.

27. TFO Koontz searched the above listed items while Coates ate his Panda Express purchased food.

28. TFO Koontz discovered U.S. currency in paper envelopes and loose in both the backpack and suitcase.

29. Some of the U.S. currency was hidden under the lining of the suitcase.

30. When TFO Koontz started searching, Coates stated he was in real estate and was "going to buy a house down there."

31. After TFO Koontz located the currency, he asked Coates how much currency was in the lining of the suitcase. Coates stated that there was about nine in each one, indicating that there was $9,000.00 in each white envelope.

32. TFO Myers asked Coates where the currency came from. Coates responded, "I'm a real estate agent."

33. Coates stated he withdrew the currency from his bank two days ago.

34. TFO Myers asked Coates if the currency was all in hundreds. Coates said that it was.

35. TFO Myers asked Coates if he had a receipt or receipts such as withdrawal or deposit slips, and Coates indicated that he had no such documents.

36. Coates stated his bank is "First National Dollar."

37. Investigators noted there is a First National Bank and a Dollar Bank, but none with the names combined as Coates stated.

38. TFO Myers asked Coates how much currency he was traveling with in total. Coates stated he was traveling with "about forty," indicating $40,000.

**INTERVIEW OF COATES AT FIG/CNIU OFFICE**

39.     Coates voluntarily accompanied investigators to the FIG/CNIU office to discuss the money that was discovered and to count the money in a more private setting.

40.     Upon arrival at the FIG/CNIU office, a thorough search of Coates's possessions was conducted by SAs Curry and Luethans.

41.     Coates originally stated he was a real estate agent in the Pittsburgh area and had been since 2020.

42.     When questioned more specifically about being a licensed real estate agent, Coates stated he was a real estate investor and did not have a real estate agent license.

43.     Coates stated he had an LLC under his last name Coates, LLC.

44.     Coates stated he works and invests with a person named "Frank Jones" who started him in the business.

45.     Coates stated Frank Jones has a business under the name Kennedy Notary in Pennsylvania.

46.     Coates specified the business name was Kennedy Notary and not a Notary Public.

47.     No such name could be found regarding real estate in Pennsylvania. However, a Notary Public with the name Kennedy Notary does exist.

48.     Coates provided his cell number ending in 7455 to the investigators.

49.     Investigators' inquiry into that cell number revealed two calls from one or more inmate in the Pennsylvania Department of Corrections, most recently on May 6, 2024.

50.     Coates stated the purpose of his trip to Los Angeles was to visit his girlfriend and look at some houses.

51.     When questioned about his girlfriend, Coates confessed she is a stripper and possibly an escort who he knows as "Melissa Cox."

52.     Coates was unable to or unwilling to provide contact information regarding Melissa Cox.

1      53.    Coates stated he would get a hold of a friend of a friend to get a hold of her

2  when he got to Los Angeles.

3      54.    Coates mentioned the name Melissa Cox could even be a fake name.

4      55.    Coates was unable to or unwilling to provide the name of the exotic dance

5  club where "Melissa Cox" worked.

6      56.    Coates stated the purpose of taking the currency to Los Angeles was to look

7  at property to invest in, specifically houses.

8      57.    Coates was unable to or unwilling to provide any information regarding

9  real estate properties he was going to look at, correspondence with anyone regarding

10  looking at real estate in California, listing or advertisements of real estate, or

11  communications regarding real estate.

12      58.    Coates stated real estate is his primary job, but he also sells merchandise he

13  described as sweat suits out of his car in the Pittsburg area.

14      59.    Coates was unable to or unwilling to provide further information regarding

15  his clothing sales.

16      60.    Coates stated he has not filed taxes or reported income in several years but

17  estimated his 2023 earnings to be approximately $60,000-$65,000.

18      61.    Prior to counting the currency, TFO Koontz asked Coates if all the currency

19  he was in possession of was his. Coates initially responded by saying yes.

20      62.    Later, Coates stated half the currency was his, and half belonged to Frank

21  Jones, his real estate investing partner.

22      63.    Later, Coates stated approximately $47,000 belonged to Frank Jones.

23      64.    Coates was unable to or unwilling to provide contact information for Frank

24  Jones.

25      65.    Coates stated he withdrew $9,800 a couple days ago from his Coates, LLC,

26  checking account at First National Bank.

27      66.    Coates stated he no longer banks at Dollar Bank.

28

67.     Coates stated he obtained a cashier's check and later had someone on the street that he did not know give him cash for the cashier's check.

68.     Coates was unable to or unwilling to provide documentation of his recent withdrawal of $9,800 from any bank or receipts showing a cashier's check had been issued, obtained, or cashed.

69.     During the conversation, TFO Myers asked Coates again how much currency total he was traveling with, and Coates changed his estimate to approximately $60,000.

### CANINE EXAMINATION

70.     On May 8, 2024, TFO Liz Poole deployed Certified Narcotic Detection canine "Moxie" to conduct an examination of the currency found in Coates's possession.

71.     Moxie is a 3-year-old female black Labrador/Border Collie, trained and certified to detect the odors of cocaine, heroin, methamphetamine, and fentanyl.

72.     Moxie is currently certified with the National Police Canine Association (NPCA) and last certified on September 24, 2024. Moxie is also currently certified with the National Narcotic Detector Dog Association (NNDDA) and last certified on October 2, 2023. TFO Poole is Moxie's only handler. If at any time during the examination Moxie smells one of the odors she is trained to detect, Moxie will present an active/passive alert at the area she smells the odor in or on.

73.     To conduct a canine sniff test with Moxie, TFO Poole placed boxes around the area of the CNIU office.

74.     TFO Poole then had Moxie search the area, including the boxes.

75.     TFO Poole indicated Moxie did not alert to the presence of any of the four illegal drug odors she is trained to detect in the office or in the boxes.

76.     TFO Poole then placed Moxie into her kennel which is out of sight of the main CNIU office.

77.     SA Theriault placed the currency into one of the boxes and closed it.

8

78. After approximately 10 minutes, TFO Poole once again deployed Moxie to sniff the boxes and surrounding area.

79. TFO Poole indicated Moxie alerted to the presence of one of the four illegal drugs emanating from the currency located in the box.

## INVESTIGATIVE COUNT OF U.S. CURRENCY

80. Following the canine sniff, an investigative count of the currency was conducted by TFO Koontz as witnessed by SAs Luethans and Theriault.

81. An investigative count was conducted both to verify the amount of currency and to compare the actual total of the currency being transported by Coates to the total Coates claimed to be carrying.

82. The investigative count revealed Coates was transporting $60,503 of suspected drug proceeds.

## INVESTIGATION INTO COATES

83. A check of the law enforcement databases revealed Coates had drug criminal history for dealing in cocaine or narcotic drugs in six separate cases and has served prison time for a drug conviction.

84. DEA's review of preliminary financial records showed suspicious activity between October 2021 and September 2023.

85. During this time, Coates appears to have conducted numerous suspicious peer-to-peer transactions occurred and numerous currency exchanges, in both small and large denominations.

86. Coates claims to be the owner of Coates, LLC.

87. A search of Coates, LLC, in the Pennsylvania Corporation Commission revealed that this is an active business LLC with an initial filing date of March 3, 2020, and a business address of 1009 First Street, McKees Rocks, PA 15136.

88. Through an open-source Google map search, this address appears to be a residential home.

89.     A search in commercial databases for Coates, LLC, revealed the same results. No ownership or registered agent information is listed.

## COATES BORDER CROSSING RECORDS

90.     Research conducted revealed the following quick turnaround border crossings for Coates:

a) On March 21, 2023, Coates traveled on American Airlines flight #1304 from San Jose del Cabo International Airport in Mexico (SJD) to Dallas Fort Worth (DFW).

b) On March 18, 2023, Coates traveled on American Airlines flight #836 from Charlotte Douglas International Airport in North Carolina (CLT) to San Jose del Cabo International Airport in Mexico (SJD).

c) On December 4, 2022, Coates traveled on Delta flight #1976 from Lynden Pindling International Airport (NAS) on the island of New Providence to Atlanta-Hartsfield-Jackson International Airport in Atlanta, Georgia (ATL).

d) On December 2, 2022, Coates traveled on Delta flight #1938 from Atlanta-Hartsfield-Jackson International Airport in Atlanta, Georgia (ATL) to Lynden Pindling International Airport (NAS) on the island of New Providence.

e) On January 23, 2022, Coates traveled on Delta flight #1800 from Sangster International Airport in Montego Bay, Jamaica (MBJ) to Atlanta-Hartsfield-Jackson International Airport in Atlanta, Georgia (ATL).

f) On January 19, 2022, Coates traveled on Delta flight #1997 from Atlanta-Hartsfield-Jackson International Airport in Atlanta, Georgia (ATL) to Sangster International Airport in Montego Bay, Jamaica (MBJ).

91.    Coates made his own airline reservation, using a phone number ending in 7060.

92.    Research for phone number ending in 7060 revealed it belongs to an Aerial Commercial cell phone registered to Antwan Coates.

93.    Investigators' inquiry into the telephone number ending in 7060 revealed 273 tolls through March 27, 2024.

## COATES'S CRIMINAL HISTORY

94.    The criminal history inquiry for Antwan Lamont Coates, revealed the following drug related arrests:

(a)    On May 17, 2021, Coates was arrested for violation of controlled substance/drugs and cosmetic act and fleeing to elude the police department by the Pittsburg Police Department.

(b)    On April 25, 2021, Coates was arrested as a fugitive from justice by the Somerville Police Department.

(c)    On September 19, 2017, Coates was arrested for violation of controlled substance/drugs and cosmetic act by the Waynesburg Police Department.

(d)    On January 28, 2011, Coates was arrested for violation of controlled substance/drugs and cosmetic act, receiving stolen property, and possession of firearm with altered number by the Allegheny Police Department.

(e)    On January 22, 2011, Coates was arrested for violation of controlled substance/drugs and cosmetic act by the Pittsburg Police Department.

(f)    On February 16, 2010, Coates was arrested for driving while on suspended license, and violation of controlled substance/drugs and cosmetic act.

1

2

3

      (g) On May 7, 2008, Coates was arrested for fleeing to elude a police office and violation of controlled substance/drugs and cosmetic act by the Pittsburg Police Department.

4

### COATES'S CAR RENTAL REPORT

5

6

7

95.    A search of online car rental receipts for Coates with his Pennsylvania driver's license number ending in 0060 through rental car databases (Enterprise Rent-A-Car, Alamo, Dollar, Hertz and Thrifty) identified the following rental receipts:

8

9

10

11

      (a) Enterprise rental for the dates 07/02/2024 through 07/08/2024 from the Pittsburgh North Hills in Pittsburgh, Pennsylvania. Coates rented a Ford with license plate #GJ5H1J and drove 400 miles during the rental period.

12

### VEHICLES REGISTERED TO COATES

13

14

15

96.    A check of Pennsylvania Department of Motor Vehicle records revealed Coates has two vehicles registered under his name: 2012 Kia with license plate number KFX0360 and 2021 Dodge with license plate LYW4786.

16

17

97.    The 2021 Dodge lists a secondary name of Timika Denise Jordan ("Jordan").

18

19

98.    A criminal history inquiry for Jordan revealed she has been arrested for forgery and theft by deception.

20

### COATES'S INCOME

21

22

99.    Pennsylvania Department of Labor records revealed Coates has received no reported wages or unemployment income within the last two years.

23

24

25

26

100.    A law enforcement's check of Coates's income revealed much of Coates's income is unverifiable. Coates income includes transfers from Coates's First National Bank of Pennsylvania account from 07/22/2022 to 11/02/2022, and a total of $39,665.21 in ATM deposits and other deposits from unknown sources.

27

28

12

101.   A review of Coates's PNC Bank account records revealed suspicious activity including from 04/06/2020 to 02/04/2021 a total of $130,996.68 in ATM deposits and Visa personal payments from unknown sources, as well as Cash App deposits from multiple senders.

102.   Coates's Block, Inc. account revealed suspicious activity involving Cash App token xxxxxxxqug2 associated with Coates and linked to PNC Bank and Dollar Bank accounts owned by Coates. From 09/11/2020 to 03/01/2021 Coates sent Cash App payments totaling $22,681 and received payments totaling $12,215 to/from multiple persons. This activity includes 216 transactions.

103.   Review of activity related to Coates's Dollar Bank account, ending in xxxxxx6734, revealed suspicious activity, including the following:

a)  On 05/21/2021, Coates (occupation listed as self-employed handyman) exchanged $10,870 in U.S. currency (small bills to large denominations) into bank account ending in 6734 owned by Coates. From the exchanged amount, $9,800 was deposited and $1,070 was withdrawn.

b)  From 06/25/2021 to 09/24/2021 a total of $25,830 in ATM and counter deposits from unknown sources were made into account ending in 6734.

c)  From 10/01/2021 to 01/24/2022 a total of $20,039 in ATM and counter deposits from unknown sources were made into account ending in 6734.

d)  From 01/25/2022 to 05/17/2022 a total of $8,550 in ATM deposits from unknown sources were made into account ending in 6734.

e)  From 03/05/2022 to 04/08/2024 Coates exchanged a total of $31,600 and an additional $48,050 was deposited at ATMs from unknown sources.

f)  On 02/22/2024 Coates (occupation listed as handyman/bar restaurant owner) exchanged a total of $17,490 into bank account ending in 6895 on behalf of Coates, LLC (bar/restaurant business) in increments of $9,210 and $8,280. From the exchanged amount, a total of $14,300 in

1  increments of $9,000 and $5,300 was deposited and $3,190 was

2  withdrawn.

3  104.   Based on the information, investigators believe the defendant currency

4  found in Coates's possession was not legitimately earned and is likely to be proceeds

5  from illicit drugs sales and or was intended to be used to purchase illicit drugs.

6  105.   On May 8, 2024, FIG/CNIU investigators informed Coates the money was

7  being seized and would be subject to administrative forfeiture proceedings.

8  106.   Coates was provided with a DEA-12 and told additional notification and

9  instructions would be sent in the mail.

10  107.   Coates provided investigators with his best mailing address to receive

11  notification.

12  108.   Coates was given an email address where he could send any documentation

13  that supported the legitimacy of the seized currency.

14  109.   Coates refused to sign the DEA-12 and the evidence bag containing the

15  currency.

16  110.   Coates was given a copy of the DEA-12 as a receipt.

17  111.   On July 22, 2024, DEA Headquarters received a claim from Antwan

18  Coates, through counsel Eric Park, Esq., 21 Prospect Ave, Glen Cove, NY 11542.

19  112.   On or about July 29, 2024, DEA referred the matter to the United States

20  Attorney's Office for judicial forfeiture proceedings.

21  **FIRST CLAIM FOR RELIEF**

22  113.   The United States incorporates and realleges Paragraphs 1-112.

23  114.   The defendant currency was furnished or intended to be furnished or

24  intended to be furnished by a person in exchange for a controlled substance or listed

25  chemical in violation of the Controlled Substances Act, 21 U.S.C. § 801 *et seq.,* or

26  constitutes proceeds traceable to such an exchange, or was used or intended to be used to

27  facilitate a violation of Title II of the Controlled Substances Act and therefore is subject

28  to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6).

14

**SECOND CLAIM FOR RELIEF**

115.    The United States incorporates and realleges Paragraphs 1-113.

116.    The defendant currency constitutes or is derived from proceeds traceable to some form of specified unlawful activity, conducted and attempted to conduct a financial transaction, i.e., the movement of the proceeds of trafficking in controlled substances in violation of 18 U.S.C. § 1952, and therefore is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

WHEREFORE, the United States of America prays that process of warrant *in rem* issue for the arrest of the defendant property; that judgment be entered declaring the defendant property be forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other and further relief as this Court deems just and proper, together with the costs and disbursements of this action.

DATED this 17th day of October 2024.

GARY M. RESTAINO
United States Attorney
District of Arizona

*/S/ Joseph F. Bozdech*
JOSEPH F. BOZDECH
Assistant United States Attorney

15